## Case No. 2,965.

COHEN et al. v. The MARY T. WILDER et al.

[Taney, 567.][1]

Circuit Court, D. Maryland. Nov. Term, 1856.

COLLISION — VESSEL AT ANCHOR — LOOK-OUT — LIGHTS—MUTUAL FAULT.

1. Where a vessel was at anchor at night, in the Patapsco river, in the channel through which sea-going vessels must pass in going to and from Baltimore, with no light set and no look-out, the wind blowing an eight knot breeze, and was run into by another vessel: *Held*, that there was gross negligence on the part of the vessel at anchor.

2. In the position in which she was anchored, it was her duty to have shown a light, during the period of darkness, and also to have had a look-out, competent to perform his duty, and who diligently performed it.

3. The omission either to set a light, or to have a competent look-out, was culpable negligence, and made the vessel liable for any damage another vessel might sustain by running into her in the dark, unless the colliding vessel was also in fault, and contributed to the disaster by some want of care or skill on her part.
[Cited in The Clara, Case No. 2,787, 102 U. S. 203.]

4. But if the disaster was, in any degree, occasioned by the want of proper care and vigilance on the part of the vessel under weigh, she must share the loss, notwithstanding there was gross negligence on the part of the vessel at anchor.

5. The want of a light on board the colliding vessel cannot affect the case, as this did not in any degree contribute to the disaster, and could have exercised no influence in preventing

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

it; inasmuch as there was nobody on the deck of the vessel at anchor to see it, and to exhibit a light in return, or to hail the other vessel on her approach.

[Cited in The Kallisto, Case No. 7,600.]

Appeal from the district court [of the United States for the district of Maryland].

In admiralty. The libel in this case was filed on the 11th of November, 1854, by the appellants [Estate P. Cohen and Andrew J. Cohen], owners of the barque Phantom, to recover damages sustained by said barque coming into collision with the brig Mary T. Wilder, on the night of the 3d of November, 1854, whilst the said brig was lying at anchor at the mouth of the Patapsco river. The libel was filed against the brig and her master, and the vessel was attached to abide the result, but released on the proper stipulation being entered into by Samuel Patterson, the claimant, on the part of her owners, who resided in the state of Maine. An answer to the libel was filed by Enoch B. Cunningham, master of the brig, on his own account, and on account of said Samuel Patterson, claimant, on behalf of the owners. The evidence adduced on both sides is substantially stated in the opinion of the court. The libel was dismissed with costs [case not reported] in the district court (Giles, J.), and an appeal was taken, and argued in this court.

Wm. B. Perine, for appellants.
Wallis & Thomas and T. K. Howard, for appellees.

TANEY, Circuit Justice. This is an appeal from the decree of the district court of the United States for the district of Maryland, dismissing the libel filed by the appellants. The appellants are the owners of the barque Phantom, and the libel was filed to recover damages for injuries sustained by the barque in a collision with the Mary T. Wilder. The collision took place in the Chesapeake bay, on what are called the "Five Fathom Shoals," which are about five miles below the mouth of the Patapsco.

It appears that the brig Mary T. Wilder came up the bay on the 2d of November, 1854, and anchored on the five fathom shoals about two o'clock in the morning of the third. These shoals are in the channel through which sea-going vessels are obliged to pass in going to and from Baltimore; and such vessels frequently anchor there; the channel at this place is about a mile and a half wide, and narrower further up. On the night of which I am speaking, there was a bright moon, and vessels could be seen at a considerable distance, until the moon went down; it set about five o'clock in the morning, and the sun rose about half past six; and in the interval between the going down of the moon and broad daylight, it was very dark, with a vapor on the water, which made it difficult, if not impossible, to see a vessel at anchor, and without sails, at the distance of

a hundred yards. There was a fresh wind from the southwest, during the night, which was a free wind for vessels bound to Baltimore, and strong enough to bring them up at the rate of eight miles an hour, when under full canvas. The Mary T. Wilder came up without a pilot, and had none on board when the collision happened; she had no light during the night, nor any look-out.

It is true, that the witnesses on the part of the respondents state, that the cook of the brig had the watch on deck. But he says he went up to his watch when the moon was just setting, at about half-past four, and went below again at five; and thinks he could not have been down five minutes before he felt the shock of the collision; that he had not seen the barque Phantom, to notice her, before he went below; that he did not notice her, because it was light enough for any vessel to be seen; and that he had never been up the Chesapeake before, and did not notice how the wind was blowing. Certainly, such a watchman (if he can, with any propriety, be called by that name) cannot be regarded as a look-out, such as the law requires, even if he had remained on deck; but at the time of the collision, no one was on deck; every man on board was asleep except the cook, and he was below taking refreshment.

Upon this evidence, it is too clear to be disputed, that there was gross negligence on the part of the Mary T. Wilder. In the position in which she was anchored, it was her duty to have shown a light during the period of darkness; and also to have had a look-out competent to perform the duty, and who diligently performed it; ordinary prudence required both of these precautions, independently of any established usage on the subject; and the omission of either was culpable negligence, and made the vessel liable for any damage another vessel might sustain, by running into her during the period of darkness, unless the colliding vessel was also in fault, and contributed to the disaster by some want of care or skill on her part.

This brings me to the testimony in relation to the management of the Phantom. This vessel had a pilot on board, under whose direction she had come up the bay, bound for Baltimore; she had shortened sail some time before the collision, in order that she might not enter the river Patapsco before daylight, and was going at the rate of only four or five miles an hour. It was the first mate's watch, and he states that he had with him a look-out stationed on the topgallant forecastle, and two on the bow, looking over the rail, and a competent seaman at the helm; that he himself was standing on the larboard side of the deck, when the man on the forecastle sang out, that there was a vessel on the starboard bow; that he immediately went over to that side and saw the vessel, and sang out to the man at the wheel to starboard his helm, which he did; but before she would answer her helm, she struck the

other vessel, and at that time it was so dark, that he could not see a man from one end of the vessel to the other. The testimony of the mate is substantially corroborated by that of the pilot, who was heaving the lead at the time the alarm was given. It is true, there are some discrepancies between them, as to the time occupied in particular transactions, and the distance at which a vessel at anchor might be seen; and some, indeed, in different parts of the pilot's own deposition. But these discrepancies are not of sufficient importance to impair, in any degree, their credit as witnesses; such estimates of times and distances, are always and necessarily vague and indefinite, being generally made from recollection afterwards, and almost always vary to some extent, when made by different men, in relation to the same transaction.

The pilot testifies to the darkness of the weather, the sufficiency of the look-out, the difficulty of seeing a vessel at anchor until near to her, if she had no light; and to the propriety of the measures taken to avoid the collision, after the Mary T. Wilder was discovered; he also swears that the vessels were entangled for thirty-five or forty minutes, and that the day had just broken when they got clear.

The master of the Phantom, it appears, is unable to speak on the subject; he was in bed at the time, and when he hurried on deck, his attention was altogether directed to the vessel alongside, and he did not observe the state of the weather, until after they were separated; he could then see vessels at a distance, but could not say how it was before.

The mate and the pilot, therefore, are the only witnesses on board the Phantom, who are able to speak of the circumstances which led to the collision. The sailors who were on the look-out have not been produced by the libellants; but I think their absence is sufficiently accounted for, and throws no suspicion on their case. And the two other pilots examined for the libellants, who were both on the water that night, one in the bay, and the other on the river, and therefore had their attention strongly drawn to the state of the weather, confirm the testimony of the mate and pilot, as to the darkness intervening between the close of the moonlight and the opening of the day, and the vapor upon the water, which rendered it impossible to see a vessel at anchor, without sails, and without a light until you were close upon her.

Standing upon this proof, there would seem to be no ground for imputing negligence to any one concerned in navigating the Phantom.

But the respondents contend, that there was light enough to have seen the Mary T. Wilder at a greater distance, and in time to have avoided the collision, if the look-outs on the barque had done their duty. And undoubtedly, if the disaster was, in any degree, occasioned by the want of proper care and vigilance on the part of the Phantom, she must share the loss, notwithstanding the proof of gross negligence on the part of the brig.

I, however, see nothing in the testimony of the respondents, to impair the weight of the proof offered by the libellants upon this point. As to the light spoken of by the cook of the brig, when he went below at five o'clock, it was the light of the moon, which set about that hour, as already stated. He says he had not been below more than five minutes before the collision; but he is obviously greatly mistaken in his estimate of the time; for all of the witnesses agree that it was broad daylight when the vessels separated, and as they appear to have been entangled for half an hour or more, the collision could not have taken place at five minutes past five, as the cook supposes, but about six o'clock, or a few minutes before. The light of the moon had faded away long before that time.

As regards the other witnesses who were on board the brig, although they all say they could have seen vessels at a considerable distance, when they came on deck, immediately after the collision, it must be remembered, that they were all aroused from their slumbers by the shock, and their attention exclusively drawn to the vessel actually in contact, and they were not likely to observe how far off they could see other vessels, from which no danger was apprehended. Indeed, it would hardly be just to them, to suppose that they were looking out for distant vessels, when the danger alongside demanded all their attention; and in this respect their testimony is hardly entitled to any weight, when in conflict with the testimony of witnesses who were watching during the whole period of darkness, and whose duty and employment it was, to look out, as far as they could see, in order to guard against danger to themselves. The respondent's witnesses appear to have recollected the light as it was when the vessels separated and they had time to look about them, and to have supposed it was equally bright when the vessels came together. This is obvious from the testimony of the mate; for although he, like the others, speaks of being able to see vessels a good way off, and says he thinks he could have seen one at the distance of three-quarters of a mile, yet he admits that he did not see one and did not look, because his attention was engrossed altogether by the one foul of them; but he also states that it was dawning day when he came up, and daylight before they got clear. Certainly, the mere dawn of the day would not immediately dissipate the darkness which followed the going down of the moon. The testimony of the mate of the Mary T. Wilder upon this point, tends strongly to confirm, rather than impeach, the testimony of those who were on board the Phantom, as regards the darkness of the

weather, immediately before and at the time of the collision.

Neither can the want of a light on board the Phantom influence the decision; it did not in any degree contribute to the disaster, and could have exercised no influence in preventing it; for there was nobody on the deck of the brig to see it, and to exhibit a light in return, or hail her on her approach.

The testimony of Thomas L. Libby, master of the Young Republic, has also been relied on for respondents; he says he was anchored about half a mile below the Mary T. Wilder, with which vessel he had come up the bay, and anchored about the same time with her, that is, about two or three o'clock, when the moon was shining, and a vessel could be seen at a considerable distance; he says the Phantom passed him about five o'clock, and that the moon, according to his time, went down between four and five; she, therefore, passed after the moon had set, and when the darkness was thickening every moment. This agrees with the testimony of the pilot of the Phantom, who says he passed within fifty yards of this vessel, and that the moon was then down; but Libby says it was light enough, at that time, to see the Mary T. Wilder from his vessel. He does not say that he actually saw her, or that he looked towards her; and from the residue of his testimony, it is evident that, if he had made the experiment, he would have proved himself mistaken in this opinion; for, although the Phantom passed so close to him, he did not discover her name on her stern; and although he never left the deck afterwards until daylight, except for a minute or two, and his business on deck must have been to look out, yet he never saw the Phantom after she passed, until the next morning, after she was clear of the Mary T. Wilder, and had proceeded two miles beyond her up the bay. He appears to have lost sight of her as soon as she passed him, and he did not see her when she was approaching the Mary T. Wilder, nor while she was entangled with her. This is strong evidence of the darkness at that time.

Neither is the omission of the Young Republic, and the other vessels mentioned in the testimony of Libby, to hang out lights any defence to the respondents; it only shows that others were equally careless, but were more fortunate in escaping from the hazards to which they imprudently exposed themselves.

In fine, the testimony shows that the Mary T. Wilder was anchored in a great thoroughfare of navigation, through which vessels were constantly passing in the night as well as the day; that during a period of great darkness, she showed no lights, and had no look-out. And when acts of such culpable negligence are proved, endangering life as well as property, justice requires that she should be held responsible for any injury which another may sustain, unless it can be clearly shown that the colliding vessel might, with due care and vigilance, have prevented the disaster. This, in my opinion, has not been done in this case.

The decree of the district court, dismissing the libel, must therefore be reversed, and a decree passed for the amount of damage found to have been sustained by the appellants, with interest thereon from the 3d day of November, 1854.